UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 05-20770-CR-COOKE/BANDSTRA

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

GLORIA FLOREZ VELEZ,
BENEDICT P. KUEHNE, and
OSCAR SALDARRIAGA OCHOA,

    *Defendants*.

_____/

## CORRECTED
## ORDER DENYING AND DEFERRING RULING ON
## IN PART DEFENDANTS' MOTIONS TO DISMISS COUNT SEVEN OF
## THE THIRD SUPERSEDING INDICTMENT AS TIME BARRED AND
## FAILING TO STATE AN OFFENSE

**THIS MATTER** is before the Court upon Defendant Oscar Saldarriaga's Motion to Dismiss Count Seven as Time Barred [DE 134] and Motion to Dismiss Count Seven For Failure to State An Offense [DE 133], both filed July 15, 2008, as well as Defendant Benedict P. Kuehne's Motion to Dismiss Count Seven [DE 138], also filed July 15, 2008. Defendants Kuehne and Gloria Flores Velez moved to adopt Saldarriaga's motion [DE 134]. I granted Velez's Motion to Adopt, but never ruled on Kuehne's because his motion involved issues of possible tolling to which I expected the Government to respond. Instead of responding directly to the motion to adopt, the Government, in a footnote to its opposition to the motion to dismiss, stated that for purposes of the motion to dismiss it will not oppose Kuehne's adoption. Accordingly, Defendant Kuehne's Motion to Adopt [DE 137] is **GRANTED.** The Defendants' have otherwise joined in with or adopted their respective co-defendants' motions.

    The present motions have been fully briefed, and the Court heard argument from counsel for both sides on November 25, 2008. Briefly, the three issues raised in the motions are whether Count Seven is time barred, whether the Third Superseding Indictment (the "Indictment") is

deficient because it fails to identify the false representations necessary to prove the grand jury's wire fraud charge, and whether the alleged right of the Colombian government to seize or forfeit the funds at issue does not constitute property under the mail and wire fraud statutes. For reasons explained below, this Court concludes that Count Seven of the Indictment is not time barred and that Count Seven is not, as regards the issue of false or fraudulent representations, Constitutionally deficient. As to the third basis -- what constitutes property -- because of the amount of evidence already presented, and the apparent wish of the parties to present further evidence from their respective experts, the Court defers ruling on this ground until after a hearing on the issue.

## I. BACKGROUND

The background of this case has been set forth in numerous documents, so I will recite only the facts necessary to discuss and rule on the present motions. On May 1, 2008, the Government filed its Third Superseding Indictment against Defendants [DE 102]. Count Seven of the Indictment charged the Defendants with Wire Fraud Conspiracy under 18 U.S.C. §§1349 and 1343 in connection with the funds and transfers of funds used to pay Fabio Ochoa's criminal defense team.

Count Seven states the object and purpose of the alleged wire fraud conspiracy:

> It was an object of the conspiracy to utilize the BMPE [Black Market Peso Exchange] to wire transfer funds from Colombia, South America, to the United States, in order to avoid detection of the transfers by the Government of Colombia so as to defraud the Government of Colombia of its right to seize assets that were the proceeds of narcotics trafficking and to transfer and use those funds to pay the Ochoa criminal defense team and enrich themselves.

The Defendants argue that the five-year statute of limitations, as set forth in 18 U.S.C. §3282, bars prosecution of this count because the last transfer from Colombia to Kuehne's Trust Account was April 15, 2003, five years and two weeks before the Indictment.[1] The Government

---

[1] A Second Superseding Indictment was also drafted, but for reasons unknown to either party or the Court, that indictment was never docketed. The Government has not argued that the Second Superseding Indictment should apply for purposes of analyzing the statute of limitations. In any case, that indictment would be subject to the same argument from Defendants, as it was filed April 17, 2008, five years and two *days* after the date Defendants argue the statute began to

does not dispute the applicability of the five-year statute of limitations, but argues that the conspiracy was not complete, and therefore the statute did not begin to run, until Kuehne received his last payment from the Ochoa defense team on February 6, 2004.

Count Seven also states, in relevant part, that Defendants "devised or intended to devise a scheme or artifice to defraud by means of false or fraudulent pretenses, representations, or promises and transmitted or caused to be transmitted by means of wire in interstate or foreign commerce, writings . . . for the purpose of executing such a scheme or artifice . . . ."  Defendants contend that the Indictment fails to identify the false representations on which the charge is based, and is therefore Constitutionally deficient.  The Government provides two arguments for why Count Seven is not deficient: (1) that a typographical error occurred and the Court should consider Count Seven to charge only that the Defendants devised or intended to devise a scheme or artifice to defraud, making the more specific "false and fraudulent pretenses . . ." language mere surplusage; and (2) that the Indictment does set forth sufficient allegations of false representations.

## II. ANALYSIS

The Federal Rules of Criminal Procedure and the case law of the Eleventh Circuit make clear that the Defendants have a right to a pre-trial determination of the timeliness of Count Seven.  In fact, Rule 12(b)(3)(B) states that a defendant must raise before trial "a motion alleging a defect in the indictment . . . ."  *See also United States v. Ramirez*, 324 F.3d 1225, 1227-28 (11th Cir. 2003) (discussing waiver of Rule 12(b) motion where a defendant failed to raise the issue of defect in a pretrial motion).  Rule 12(d) then requires this Court to decide the motion unless good cause to defer ruling exists.  A the Eleventh Circuit succinctly noted:

> A Rule 12(b)(2) motion aimed at the sufficiency of the indictment which is capable of determination without the trial of the general issue shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict . . . . *United States v. Coia*, 719 F.2d 1120, 1123 (11th Cir.1983).  A defense is capable of pretrial determination if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense. *United States v. Covington*, 395 U.S. 57, 60, 89 S.Ct. 1559, 1560-61, 23 L.Ed.2d 94 (1969).

---

run.

*United States v. Adkinson*, 135 F.3d 1363, 1369 (11th Cir. 1998) (internal quotation marks and citation omitted). The Court, however, in addressing the motion "should approach with delicacy and circumspection the question of whether to dismiss a case on the ground that, at trial, the proof, as a matter of law, would fail to establish the commission of the charged offense within the limitations period." *United States v. Coia*, 719 F.2d 1120, 1125 (11th Cir. 1983). Furthermore, in judging the sufficiency of the Indictment, the Court takes the allegations contained therein as true. *See United States v. Fitapelli*, 786 F.2d 1461, 1463 (11th Cir.1986). The Court must also be mindful, however, that "[s]tatutes of limitations, both criminal and civil, are to be liberally interpreted in favor of repose," *United States v. Phillips*, 843 F.2d 438, 443 (11th Cir. 1998) (citations omitted), and "[w]hen doubt exists about the statute of limitations in a criminal case, the limitations period should be construed in favor of the defendant." *United States v. Gilbert*, 136 F.3d 1451, 1454 (11th Cir. 1998) (citation omitted). With this framework, I turn to the issues before me.

### A.

The first question before this Court is relatively simple: For purposes of the statute of limitations, when did the alleged wire fraud conspiracy end? The answer is not as easily forthcoming. "[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." *Grunewald v. United States*, 353 U.S. 391, 397 (1957). *Grunewald* dealt specifically with the government's attempt to increase the duration of an alleged conspiracy by including attempts to conceal the conspiracy and maintain its secrecy long after the main criminal goal of the conspiracy was accomplished. The Court found that it could not "accede to the proposition that the duration of a conspiracy can be indefinitely lengthened merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished." *Id.* at 405. The Court further drew the distinction between "acts of concealment done in furtherance of the main criminal objectives" and "acts of concealment done after these central objectives have been attained . . . ." *Id.* In the over five decades since

*Grunewald* was decided, the Courts of Appeals have applied the Supreme Court's "crucial question" to a variety of conspiracy cases.

The Government relies chiefly on "economic conspiracy" cases where the final goal of the conspiracy was a monetary payout derived directly from the object of the criminal conspiracy.[2] In *United States v. Girard*, 744 F.2d 1170 (5th Cir. 1984), the defendant was indicted for conspiring with employees of the Housing Authority of New Orleans to rig a bidding process so that Girard's company would secure a plumbing contract. Girard contended that the object of the conspiracy was to secure the contract, and once he was awarded the contract, the conspiracy ended. *Id.* at 1172. The Fifth Circuit took a different view, finding that Girard's contention was "overly narrow" and that his true interest "lay not in securing the contract itself, but in obtaining the money thereunder." *Id.* The Government, here, would have this Court liken the transfers from Colombia to Kuehne's Trust Account as the securing of the contract, and the last payment made from the Ochoa Defense Team to Kuehne as the payoff which triggers the limitations period.

The Second Circuit, in *United States v. Mennuti*, 679 F.2d 1032 (2d Cir. 1982), also found "that a conspiracy continues until the conspirators receive their anticipated economic benefits . . . ." *Id.* at 1035. *Mennuti* is very factually distinct, however. There, Menutti agreed to burn the house of a co-conspirator so that the co-conspirator could recover the insurance proceeds. *Id.* at 1033-34. By agreement, Menutti would then have the exclusive right to sell the property after its destruction. *Id.* at 1034. The Second Circuit eventually held his actual payoff, and the last overt act triggering the statute of limitations, was the purchase of the house at a

---

[2]In arguing the statute of limitations issues, Defendants and the Government have cited to two Eleventh Circuit cases, *United States v. Harriston,* 329 F.3d 779 (11th Cir. 2003) and *United States. v. Dynalectric Co.,* 859 F.2d 1559 (11th Cir. 1988). I have not overlooked these cases, but upon review of them, have found them to be less than instructive on the present matter. *Harriston*, cited by the Defendants for the proposition that a conspiracy is complete when its purpose or purposes have been accomplished, involved a racketeering conspiracy and a conspiracy to distribute cocaine and marijuana. 329 F.3d at 781. Both of those conspiracies are non-overt act conspiracies, requiring allegations and proof that the conspiracy continued into the limitations period different from the type of allegations and proof necessary here. *Dynalectric*, while an overt-act conspiracy, was a conspiracy to restrain trade with an underlying bid-rigging agreement. 859 F.2d at 1562-63. The facts and analysis do not lend themselves well to application in this case. To the extent *Dynalectric* is applicable, it is an economic conspiracy case that would not change this Court's analysis.

bargain price prior to resale. *Id.* at 1035. The Second Circuit concluded that even if the central objective of receiving the insurance check was complete, the conspiracy was not ended because "the conspiratorial agreement included a payoff to each conspirator . . . ." *Id.* According to the court, since the conspirators had made receipt of economic benefits an object of the conspiracy, the conspiracy continued until each conspirator received his payoff. *Id.* Because the court found that Mennuti's benefit came from the ability to buy the house at a reduced price, it dismissed his argument that receipt of economic benefits should not apply to a statute of limitations analysis where he could have chosen to not resell the property and therefore be subject to liability indefinitely. *Id.* The Government here, with no substantive analysis, asks this Court to find that Defendant Kuehne's receipt of payment from the Ochao Defense Team was the anticipated payoff. There is no allegation however, that the Defendants made this specific "payoff" an object of the alleged conspiracy, nor that there was an agreement to divide any profits.[3]

Finally, the Government relies upon *United States v. Helmich*, 704 F.2d 547 (11th Cir. 1983). In *Helmich*, the defendant pleaded guilty to a conspiracy to commit espionage. *Id.* at 548. He then appealed, arguing *inter alia* that the statute of limitations barred the indictment. *Id.* The Eleventh Circuit affirmed his conviction, noting that in pleading guilty, he admitted that part of the conspiracy was to receive financial remuneration and that he traveled to Canada for the purpose of receiving compensation. *Id.* Accordingly, the court found that "an agreement to receive financial remuneration may be part of a conspiracy . . . . [and] [i]f steps are taken to collect money owed after the secrets have already been transmitted, then the limitations period on the conspiracy does not commence upon transmittal because the payoff is an overt act." *Id.* (citing *Menutti*, 679 F.2d at 1035-36). As should be obvious from the above description, *Helmich* is distinguishable. Looked at myopically, *Helmich*'s holding that steps taken to collect

---

[3] The Indictment, Count Seven in particular, and the Government's Opposition to the Motion to Dismiss Count Seven as time barred, focus almost exclusively on payment made to Kuehne. Beyond stating that Saldarriaga and Velez worked for Kuehne, and that the three sought to "enrich themselves" there is no indication given of how or what Saldarriaga and Velez gained from the alleged wire fraud conspiracy. More importantly, there is no allegation that the three agreed to divide up an anticipated economic benefit or that they in fact did so. It is telling that the Government alleges that the last payment from the Ochoa Defense Team (non-conspirators) to Kuehne should start the running of the clock, but makes no reference to any payment from Kuehne to his alleged co-conspirators.

money due and owing from completion of prior conspiratorial acts does support the Government's argument. However, the holding must be limited by the facts of the case to situations where an alleged conspirator admits, by plea or otherwise, that the collection of financial remuneration was part of the agreed upon conspiracy. That is simply not the situation here.

*Girard* and *Mennuti* are both inapposite as their respective conspiracies were found to have specific economic objectives -- *i.e.*, the receipt of funds from a fraudulently obtained contract, and the receipt of fraudulently obtained insurance proceeds and a significant reduction in the purchase price of a house. The bid rigging in *Girard* produced a direct economic benefit to the conspirators, as did the insurance fraud in *Mennuti*. By contrast, Kuehne's retainer agreement, as paraphrased by the Government in the Indictment, made clear that he was entitled to a *non-refundable* fee of $50,000 for the first 100 hours of professional service, and set forth the applicable billing rates for any additional hours. *See* Indictment ¶7. The Government's allegations that the "verified funds were also to serve as the source of [Kuehne's] fees [and that his] fee was therefore contingent upon his determining that the funds came from untainted sources," *see id.*, cannot be taken as true in light of the non-refundable status of the initial $50,000 retainer. The allegations contradict themselves. If the initial fee is non-refundable and based on a set number of hours, then logically, at least the initial fee cannot be contingent upon Kuehne's ultimate determination of the legality of the source of the funds. The result of this is that any analogies to the economic conspiracy cases cited by the Government are significantly weakened, if not destroyed. *Helmich* fairs no better as the facts of the case cannot be analogized to the facts underlying the Indictment.

Other cases are more analogous and instructive than the Government cites. Putting aside, temporarily, the cases relied upon Defendants, *Kann v. United States*, 32 U.S. 88 (1944) and *United States v. Maze*, 414 U.S.395 (1974), I turn to decisions of the First and Second Courts of Appeals.

In *United States v. Roshko*, 969 F.2d 1 (2d Cir. 1992), the Second Circuit addressed the application of the statute of limitations to a conspiracy to adjust immigration status. In essence, the allegation was that an alien, Meir, entered into a sham marriage with an American citizen in order to obtain his green card. Once he obtained his green card, he divorced his American wife,

and married another alien, Irene, who eventually gained permanent resident status. The government indicted both Meir and Irene for, *inter alia*, conspiracy to defraud the United States by making false statements to the INS. The indictment, however, only charged that the two conspired to change the immigration status of "an alien." Irene argued, therefore, that the conspiracy necessarily ended when Meir received his green card, and the prosecution for her subsequent grant of permanent residence status was time barred. The government argued that since the indictment specifically referenced a "sham marriage" the conspiracy could not have ended until Meir had divorced his first wife. The court, however, found otherwise, holding that the object of the conspiracy was to change the status of Meir. That being achieved, the conspiracy ended, and the later "divorce was not necessary to the success of the scheme contemplated in [the] indictment." *Id.* at 7-8. Next, the court specifically addressed the government's argument that the conspiracy did not terminate until each conspirator received his or her payoff, with Irene's payoff alleged to be the change in her status. *Id.* at 8. Noting that all of the cases cited by the government were inapplicable as cases involving conspiracies for economic gain, the court distinguished the government's main case, *Mennuti*. The Second Circuit stated:

> Mennuti acted in concert with other conspirators after the completion of the underlying mail fraud offense in order to further the conspirators' general criminal objective of securing an economic windfall for themselves.
>
> In contrast, Meir's divorce and subsequent remarriage to Irene simply cannot be construed as the "spoils" or "payoffs" of the immigration conspiracy.

*Id.* at 8. The contrast is equally apropos here. Neither Kuehne nor his co-defendants is alleged to have acted in concert with other conspirators specifically to "enrich themselves" after the completion of the underlying wire fraud to get the money at issue out of Colombia and into the United States.

Even more to the point is the First Circuit case of *United States v. Doherty*, 867 F.2d 47 (1st Cir. 1989). In *Doherty* several defendants appealed from convictions for conspiracy to commit mail fraud, racketeering, and perjury, involving illegally obtaining, selling and buying of police entrance and promotion examinations. *Id.* at 51-55. Three of the defendants argued that

the statute of limitations barred their convictions because the only overt acts alleged, the receipt of salary payments, occurred outside the statutory five-year period. *Id.* at 60-61. The government responded by arguing that "the object in part was to obtain salary, so each act of receiving salary is a new 'overt act.'" *Id.* at 61. To support this argument, the government relied on *Girard*, *Helmich*, *Mennuti*, and *United States v. Walker*, 653 F.2d 1343 (9th Cir. 1981). *See id.* The First Circuit precisely and accurately expressed the defect with the government's contentions and reliance on the above-cited cases.

> It may seem reasonable to say that the act of receiving a conspiratorial objective is part of the conspiracy, where the receiving consists of one action, or a handful of actions, taking place over a limited period of time, or where some evidence exists that the special dangers attendant to conspiracies, the dangers of "concerted" activity and "group association" for criminal purposes, remain present until the payoff is received.
>
> But, where receiving the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions, such as receiving salary payments, *and* there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place, we do not see how one can reasonably say that the conspiracy continues. Rather, in these latter circumstances, one would ordinarily view the receipt of payments merely as the "result" of the conspiracy. That is what the Supreme Court suggested in *Fiswick v. United States*, when it wrote:
>
>> Though the result of a conspiracy may be continuing, the conspiracy itself does not thereby become a continuing one. Continuity of action to produce the unlawful result, or ... "continuous cooperation of the coconspirators to keep it up," is necessary.
>
> 329 U.S. 211, 216, 67 S.Ct. 224, 227, 91 L.Ed. 196 (1946) (citations omitted), *quoting United States v. Kissel*, 218 U.S. 601, 607, 31 S.Ct. 124, 126, 54 L.Ed. 1168 (1910). And, each of the cases the government has cited . . . is consistent with this approach. In each of those cases, the receipt of payment was one or a few discrete events, not an indefinite series continuing long after any active cooperation ceased. Also, in most of those cases, more than unilateral activity was at issue, for the payoff itself required cooperation; for instance, in *Helmich*, 704 F.2d at 548, the spy was

> paid by coconspirators, and in *Walker*, 653 F.2d at 1347, the realization and division of profits required "continuing cooperation." We cannot read these cases as extending the conspiracy statute of limitations indefinitely beyond the period when the unique threats to society posed by a conspiracy are present. To do so "would for all practical purposes wipe out the statute of limitations in [this kind of] conspiracy cases ..." *Grunewald*, 353 U.S. at 402, 77 S.Ct. at 972[.]

*Doherty* 867 F.2d at 61-62 (citations omitted) (emphasis in original).  The court went on to find that two of the three defendants continued in their concerted activities and that the cases cited by the government controlled.  As to the third defendant, however, it was found that the receipt of salary "[took] place well after, and isolated from, all other concerted activities, at a time when there was no further risk of conspiracy-associated dangers.  Consequently, the receipt of salary is a 'result' of, not an act in furtherance of, the conspiracy."  *Id.* at 62.  The court held that this third defendants' prosecution, with respect to the count at issue, was barred by the statute of limitations.  *Id.*

The same concerns raised by the *Doherty* court are also present here.  The final payment to Kuehne came from a non-conspirator at a time "when the unique threats to society posed by a conspiracy" were no longer present.  Payment to Kuehne is properly viewed as a result of the alleged conspiracy, not the payoff that terminates it.  The receipt of payment from the Ochoa Defense Team was, for all intents and purposes, a unilateral activity, requiring and involving no participation by the other alleged co-conspirators.  Moreover, if I accepted the Government's theory, a dispute about fees that could potentially drag on for months or years would allow the statute of limitations to extend indefinitely -- just the danger the Supreme Court meant to put an end to in *Grunewald*.

This does not end the analysis, however.  In this situation, the dates most forcefully put forth by the Defendants and the Government are both incorrect.  An alternative argument advanced by the Government is that the date of final transfer of funds from Kuehne's Trust Account to the Ochoa Defense Team, May 1, 2003, should be the triggering date.  If accepted, this date would mean that Count Seven was timely filed.  Defendants, as a corollary to their argument that the final transfer into Kuehne's Trust Account is the triggering date, argue that the transfers from Kuehne's account to the Ochoa Defense Team account "facilitated nothing more

than the ultimate *expenditure* of the funds for the benefit of Ochoa in the form of legal fees and expenses." See Motion to Dismiss Count Seven, ¶5, DE 134 (emphasis in original).

Taking, as I must, the allegations of the Indictment as true, that "[b]etween on or about January 2002 and on or about until at least May 1, 2003, [Defendants] caused to be transmitted four (4) wire transfers . . . to be used for payment for the Ochoa [Defense team]," and that an object and purpose of the conspiracy was to "transfer and use [the funds from Colombia] to pay the Ochoa criminal defense team," there is "evidence that [] concerted activity posing the special societal dangers of conspiracy [was] still taking place" after the last of the transfers from Colombia safely reached Defendant Kuehne's Trust Account. In light of the specific allegations of the Indictment, that the funds were to be used to pay for Ochoa's defense, that the three Defendants caused the money to be transferred to the Ochoa Defense Team, and that funds were not transferred until the Defendants' drafted opinion letters were issued (excepting the revised and corrected fourth letter), it is an inescapable conclusion that the alleged conspiracy continued until the funds were transferred to the account of the lawyers who actually represented Ochoa, the Ochoa Defense Team. Therefore, there was continuity of action and concerted activity on the part of the Defendants for criminal purposes, up to and through the May 1, 2003 transfer of funds from Kuehne's Trust Account to the Ochoa Defense Team. Consequently, I conclude that the alleged conspiracy continued and the statute of limitations did not begin to run until May 1, 2003. This is exactly five years prior to the date of the Indictment, and therefore the Indictment is timely, if just barely.

Returning, briefly, to *Kann* and *Maze*, I conclude that neither case supports a finding that Count Seven is barred by the statute of limitations. At best, the cases might support Defendants' arguments that payment to Kuehne was merely incidental and collateral to the alleged scheme to defraud the Colombian government. Having found, however, that the correct date for evaluation of the statute of limitations was the date of the last transfer to the Ochoa Defense Team, and not the last payment to Kuehne, these cases become irrelevant. In both cases, the Supreme Court held that the schemes had reached fruition prior to the mailings in question. *See Kann*, 323 U.S. at 95 ("[T]he scheme was completely executed as respects the transactions in question when the defendants received the money intended to be obtained by their fraud, and the subsequent banking transactions between the banks concerned were merely incidental and collateral to the

scheme and not a part of it."); *Maze*, 414 U.S. at 402 (finding that defendant's scheme to use a stolen credit card to pay for motel stays had come to fruition upon his checking-out from the motels, and that mailing of an invoice to the bank and a bill to the card owner did not satisfy the mail fraud statutes because the success of the scheme did not depend on the mailings). Moreover, to some degree, *Kann* is adverse to Defendants because it holds that the scheme only came to fruition when "[t]he persons intended to receive the money had received it irrevocably." *Kann*, 323 U.S. at 94.  Taking the allegations in the Indictment as true, the intended recipient of the funds from Colombia was the Ochoa Defense Team, who did not receive the final transfer until May 1, 2003.

## B.

Having now disposed of the issue of timeliness, I move on to evaluate the deficiencies Defendants argue exist in the Indictment.  As noted earlier, Count Seven charges that Defendants "devised or intended to devise a scheme or artifice to defraud by means of false or fraudulent pretenses, representations, or promises and transmitted or caused to be transmitted by means of wire in interstate or foreign commerce, writings . . . for the purpose of executing such a scheme or artifice . . . ." The question of deficiency raised by Defendants relates to whether the Government is required to prove the false or fraudulent representations, and if so, whether that charge is sufficiently supported by the allegations in the Indictment.

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States.,* 418 U.S. 87, 117 (1974).  "[I]f the indictment tracks the language of the statute, 'it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.'" *United States v. Bobo*, 344 F.3d 1076, 1083 (11th Cir. 2003) (quoting *Russell v. United States*, 369 U.S. 749, 765 (1962).  *See also Hamling*, 418 U.S. at 117 ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.") (internal quotation marks and citation omitted).  This Court may only dismiss an indictment "where there

is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial." *United States v. Torkington* 812 F.2d 1347, 1354 (11th Cir. 1987). Moreover, "[a] defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence, for an indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is enough to call for trial of the charge on the merits." *United States v. Mann,* 517 F.2d 259, 267 (5th Cir. 1975).[4] Lastly, "[i]t must be remembered that in testing the sufficiency of an indictment, a court must not pierce the pleadings and make a premature resolution of the merits of the allegations." *United States v. Cadillac Overall Supply Co.,* 568 F.2d 1078, 1082 (5th Cir. 1978).

The Government has drafted and filed multiple indictments in this case. They now argue that the operative Indictment contains a typographical error. The Third Superseding Indictment contains specific changes to Count Seven from the version of Count Seven in the unfiled Second Superseding Indictment. However, the Government did not see fit to change the charging language to reflect their alleged intent, or to correct the alleged scrivener's error. They can not now be heard to argue that the excluded language was left out by typographical mistake. The Government charged and the grand jury indicted Defendants on the theory that Defendants "devised or intended to devise a scheme or artifice to defraud by means of false or fraudulent pretenses, representations, or promises[.]" That this charge may have been made in error, either of apprehension or judgment, does not allow the Government to ask this Court to *ex post facto* alter the Indictment and effectively lessen the Government's burden at trial.[5] Furthermore, the specific language of the Indictment requiring proof that the scheme or artifice was accomplished "by means of false or fraudulent pretenses, representations . . ." cannot be considered mere

---

[4]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) the Eleventh Circuit adopted as binding precedent cases handed down by the Fifth Circuit prior to the close of business on September 30, 1981.

[5]If I accepted the Government's argument that the specific language regarding false representations is surplusage, and that the Government intended only to charge Defendants as having devised or intended to devise a scheme or artifice, then the Government would only need to prove the scheme or artifice; no proof regarding false fraudulent representations would be required.

surplusage. The Government's chief case to support the surplusage argument, *United States v. Kartman*, 417 F.2d 893 (9th Cir. 1969), is wholly inapplicable. There, the court found that where language in the indictment was not an element of the offense, it was surplusage which the government was not required to prove. *Id.* at 894. The charge was assault on a federal officer, with the surplusage being "knowing him to be such officer" where knowledge was not an element in the statute. *Id*. at 894. Here, by contrast, the language at issue *is* an element of the offense and comes directly from the statute.

"[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 217 (1960). "The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecuting attorney or judge." *Id.* at 218. The Government is attempting to treat the narrowing language in the Indictment as a variance that can simply be corrected by striking it as surplusage. This would vitiate the right of the Defendants to be tried solely on the charges as set forth by the grand jury. "It is the exclusive right of the grand jury to finally to determine the charges, and once it has done so neither a prosecutor nor a judge can change the charging portion of an indictment to suit [his or her] own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes." *United States v. Bishop*, No. 6:07-cr-11-Orl-28KRS, 2008 WL 4080218, *2 (M.D.Fla. Aug. 28, 2008) (slip op.) (quoting *United States v. Leichtnam*, 948 F.2d 370, 375-76 (7th Cir. 1991) (citation and internal quotation marks omitted). Consequently, I reject the Government's argument that they should be permitted to proceed to trial on the theory that the they need only prove that Defendants devised or intended to devise a scheme or artifice to defraud.

The Indictment stands as filed, and the Government, at trial, must prove that Defendants "devised or intended to devise a scheme or artifice to defraud by means of false or fraudulent pretenses, representations, or promises[.]" To this end, I agree with the Government that the Indictment sufficiently alleges false representations to sustain the Wire Fraud Conspiracy count. Count Seven properly incorporates by reference factual allegations set forth in the first thirty-five paragraphs of the Indictment. Within those paragraphs are allegations that false documents were prepared to conceal the source of the funds (*see* Indictment ¶11), that false and fraudulent

documents were used to bolster other false representations regarding the source of funds (*see* Indictment ¶16), and that false and fraudulent documents were used to conceal the method of transfer for funds (*see* Indictment ¶18). Moreover, an entire section of the Indictment, paragraphs 21-28, falls under the heading "False Statements in the Kuehne Opinion Letters." The Defendants' argument that the allegations in the Indictment, specifically those related to the opinion letters, have nothing to do with the scheme to defraud the Colombian government ignores the remaining language of the Object and Purpose section. The stated object and purpose was not only to defraud the government of Colombia, but also to "transfer and use [the transferred] funds to pay the Ochoa criminal defense team[.]" The opinion letters, and other alleged false representations, had a direct connection to the ability of Kuehne and his alleged co-conspirators to transfer the funds to the Ochoa Defense Team and for those funds to ultimately be used to pay for Ochoa's defense. This more than adequately dispels the Defendants' contention that the alleged false representations have no causal connection to the alleged fraud.

Furthermore, Defendants' reliance on *Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir. 1991) is misplaced. The Indictment contains allegations that the Defendants illegally used the Black Market Peso Exchange, and that false representations were made surrounding the use of that parallel market. Those allegations satisfy the Government's duty, at this stage of the case, to explain how Defendants' alleged false representations were reasonably calculated to deceive the Columbian government and permit the transfers both from Colombia to Kuehne and from Kuehne to the Ochoa Defense Team. *See Pelletier*, 921 F.2d at 1498 ("[T]he court uses a reasonable person test to determine whether, if the scheme had been executed, the intended victim would have acted on the misrepresentations: were the misrepresentations reasonably calculated to deceive persons of ordinary prudence and comprehension.") (emphasis removed) (citation and internal quotation marks omitted).

Finding the Indictment sufficient on its face, insofar as it relates to Defendants' argument that the Government failed to properly allege false representations, I will go no further in analyzing the Defendants' claims that the Indictment is not adequately supported. To do so would be to impermissibly pierce the pleadings and rule, at least in part, on the merits.

### III. CONCLUSION

Defendant Saldarriaga's Motion to Dismiss Count Seven as Time Barred [DE 134] is

**DENIED**.  Further, Defendant Kuehne's Motion to Dismiss Count Seven [DE 138], only as it relates to the sufficiency of the allegations of false or fraudulent pretenses, representations, or promises, is **DENIED.**  I **DEFER** ruling on Defendant Saldarriaga's Motion to Dismiss Count Seven for Failure to State an Offense [DE 133] and Defendant Kuehne's Motion to Dismiss Count Seven [DE 138], as it relates to the question of "property" under the mail and wire fraud statutes, until after a hearing on that issue.

**DONE and ORDERED** in chambers, Miami, Florida, this 30th day of December 2008.

_____
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Counsel of Record*